which is 21-11919 Carol Stewart v. Hartford Life and Accident Mr. Burke is here for the appellant. Mr. Niman is here for the appellee. Mr. Burke, I understand that you'll be presenting the argument from council table, which is A-OK with us. Thank you, Your Honor. Absolutely. And whenever you're settled and ready, no hurry. Maybe one second. No, it's all good. May it please the court, my name is Peter Burke. I represent the plaintiff's appellant, Carol Stewart. As the court may know, Ms. Stewart was diagnosed with Parkinson's disease back in 2007. And she has fought that disease and its debilitating effects, both cognitive and physical, for the last 15 years. Ms. Stewart is sitting behind me on the bench. She has also been fighting with Hartford for the last 10 years to secure her LTD benefits, waiver premium benefits, which she has rightfully owed under the policy. We are dealing with an ERISA case, as the panel realizes, and therefore we have to look at the issues through the ERISA format. Ms. Stewart raised at the district court level several procedural errors several times. We believe that those errors were sufficient to take this case out of any deferential review for Hartford. District court itself in the Otero decision followed the Second Circuit's decision of HALO versus the New Haven health claim. And found that one of these violations was sufficient by itself to take away any deference. We believe that occurred here. We've also raised an issue with the district court's plaintiffship analysis. We believe that the court did not properly do its own general review. Instead, it did more of a comparison of he said, she said, set forth Ms. Stewart's position, set forth Hartford's position. And eventually gave deference to Hartford's interpretation and adopted that as its own. So let me ask you this. So can we start with the LTD? I know there are two different things going on here, but if we start with LTD. I'll confess, I think you may be on to something with the distinction that you draw between plan and policy in the relevant language. But if we are in deference land, can we say that Hartford's interpretation of that was an abuse of discretion or is not worthy of deference? It seems to me not totally unreasonable. I'm not sure you're wrong if we were talking de novo, but I'm not sure that their interpretation is unreasonable. I believe that ERISA requires to look at the plain language of either the plan or the policy and apply it as written. And if you do so, given the uncontroverted facts that we have set forth, there has only been one plan for Burbank-Foreman that was established in August of 1989. It's never been terminated. And this was established by Logan Hinkle's declaration. So I take your point that there is a plan that was never terminated, that there was a policy that went away and then a new one came into being, right? But so, I mean, again, I take your point that plan and policy formally are different things, but is it unreasonable to think that plan might mean policy and policy might mean plan? It is, Ron. The reason why, prior policy is defined, and it does not include a definition of prior plan. And if they wanted to define it as such, Hartford had the ability to do so. Hartford defines several other terms in policy, and if the policy has these defined terms, then they are required to apply them as defined. And even the district court stated it was not a paragon of article drafting. And to reach the result that Hartford did, which the district court adopted, it had to go ahead and equate prior policy with prior terminated plan. So let me just get you to react, if you don't mind, to one question of mine, and then I'll zip it and you can talk and my colleagues can ask their questions. But so because I think this is kind of a naughty interpretive issue, I went to look at the Scalia and Garner treatise, and it said that, you know, usually this idea that different words are presumed to have different meanings holds. But it said that that rule, quote, more often than most others, assumes a perfection of drafting that as an empirical matter is not often achieved. Though one might wish it were otherwise, drafters more than rarely use different words to denote the same concept. And I wonder if we're not in that land, that you might, someone might sloppily use plan to mean policy or policy to mean plan. Well, even if we are in that plan, that's Hartford's fault. My client shouldn't pay for their mistake. They have the ability to draft the policy the way they want it. So if you are willing to say that we are in that plane, then the next step is to say that it's ambiguous. If it's ambiguous, then we go to the doctrine of contra proferitum. And, you know, that is well established as construed against them. So let me ask you this. This may be a truly stupid question, and feel free to tell me. But so how does contra proferentum, how does that kind of jibe with sort of the deference that plan administrators may or may not be owed in the interpretation and sort of execution of their own plans? Like which one of those two canons, so to speak, takes precedence? I think when we are looking at words and doing judge work, that contra proferitum applies. Even in the world of deference, the case of Hess versus Hartford out of the Seventh Circuit, which we cited, it says that deference is not abject. It also says that deference doesn't mean, I forget the other aspect of it, but it still says that the panel can use its common sense in applying this. The other aspect, I guess, jumping into my argument would be that this exclusion was never disclosed in the SPD. The SPD did disclose the one-year preexisting limitation. That is more specific, I would say, than this general exclusion. This exclusion, Hartford bore the burden of proof on it. He cited a case out of the Second Circuit that said it was a preponderance of evidence. Hartford doesn't cite one case where this exclusion was otherwise applied. They didn't produce, during discovery, a policy or a procedure or a manual interpreting it. They didn't see any outside judicial opinion to see how it could be applied. We contend that it was Hartford's burden. The court had properly placed it on Ms. Stewart, and Hartford never reached its burden. There were several errors that we believe the district court made below. The first one was not applying the defined terms. The second one was this burden of proof issue. Third, we think that the judge improperly tried to rewrite the contract because of a faulty sense of equity. We cited the Montefiore case out of the Second Circuit. Courts are required to enforce the policy or the contracts as written. They can't substitute the words and rewrite them to focus on their own sense of equity. We think that clearly happened here. We spent two pages in our brief showing that Ms. Stewart did not receive a windfall here. In fact, if she's not paid the Hartford LT benefits for which she is owed, she is going to suffer a substantial loss of income for several years. We believe that the amount that Hartford potentially owes her is close to a million dollars. As I said, she's been fighting for these benefits since 2012. Can I ask you, at the risk of moving you along before you're prepared, so we can talk about the waiver of premiums issue as well? Before you do that, can I ask one question on this? As I understand your argument, so when you're looking at how we, let's say we say the de novo interpretation is wrong, plans not policy, so then we look at whether there was a reasonable interpretation. As I understand your argument, it was very clear that part of the interpretation of looking at what was reasonable there or not was this big windfall analysis. That kind of drove the interpretation. Is that right? That was inaccurate that she was really getting a windfall. An administrator who has a conflict of interest here, they've already established he's got a conflict of interest, that they are saying that the Hartford's interpretation squared better with ERISA's goals was because it would protect the plan by keeping her from getting a windfall. That was a driving force. Is that what you're saying? I believe that was an overriding force for the district court. I think it was improper under the Montefiore case, but it was also factually incorrect. Incorrect. As we pointed out. Right. And so really, could you say, okay, the plan should have had interpreted without regard to a windfall, because it wouldn't have been a windfall. She still wouldn't have been back up to her full salary, even if she'd gotten both disability payments. Yeah, it wouldn't be salary, but it would have been total income. Total income, yes. I stand corrected that the two plan amounts at $21 a month wouldn't have taken her back to her regular income. So that there was no windfall. Okay. And that she was double dipping, and really she wasn't. She wasn't at all, Your Honor. And she paid for the premiums for the second policy anyway. She did, with her own money, after tax money. Yeah. Okay. Thank you for that. You're welcome. So the question I was going to ask you, something you said just now on the LTD side triggered this question, and I thought it was a decent segue. You said, you know, that we can't ignore the unambiguous language of the policy in order to do equity. And on the waiver of premiums side, there's this decision of ours, Helms, right? An F-second decision, Helms. Not binding on us, right, because it's a different contract, but it's out there and it's in the same space. Isn't that, though, what the court did in Helms? Didn't it ignore unambiguous language of the policy to do equity, and didn't it basically admit as much? Well, it did so in favor of the insured. Otherwise, I think the reasoning there, though, is if you took the literal interpretation of the policy that way, then the coverage would have been illusory. I mean, the only time you could ever get coverage under that interpretation would be if the person was, you know, comatose. I see that my – You can – we carried you over. Take a few minutes to unpack this issue. Okay, on the waiver of premium, we think the evidence clearly shows that there was an overriding conflict of interest, which made an outcome determinative. Ms. Stewart had originally been denied on the waiver of premium. She successfully appealed on December 5th. The appeal specialist put a note in the file basically saying that Ms. Stewart could not perform even part-time work. She is suffering from a debilitating disease. It's progressing. It's going to get worse. She approved the waiver of premium. Then, a couple weeks later, Anna K. Davis, who we believe was also in the business unit, we found some evidence of that on the Internet, and we think it's improper that she was the one ordering the testing. Parker contends that she was an appeal specialist. But we think that was the first sign of the conflict. And then out of nowhere, Ms. Stewart – Just so I'm clear, when you say we found this on the Internet, do you mean you found it on the Internet and put it before the district court, or you found it on the Internet since then? We put it before the district court. I just wanted to make sure. Okay. With an attachment to our memorandum. Got it. Then, also, the Ian Hardy LinkedIn profile and his work with the Stretch Project, him boasting about saving $3 million in reserves and receiving a standing ovation at a Hartford meeting for doing so. We think that that shows that there was an overriding conflict. The Lassiter class action complaint that we filed in California shows that what happened to Ms. Stewart was widespread. And interestingly about Lassiter, the California law actually says that you can't interpret any work the way that Hartford was trying to do here. And we also, on the waiver of premium, argue that the definition of the policy that talks about any work you can do by training, education, or experience, that definition wasn't followed to say that she could volunteer. That certainly doesn't fall in line with that definition. And she also, we raised the issue that there was no vocational analysis done or that they didn't identify any work that she could do. So I guess I would have thought, from the language of the policy, any work for which you are qualified by education, training, or experience means that you can't be expected to sort of, this is a clumsy way to describe it, but to move up in sort of the business hierarchy. Like nobody can say, oh, well, you're incapable of being a construction worker, but you could be a lawyer. But can you trade down, so to speak? Well, Judge Adams, he wrote in, I think it was the Fitts opinion, I'm not sure if we cited it, but he would say that you are not expected to become a greeter at Walmart making $7.50 an hour when you've had this other training experience and this other level of income. Okay, very well. All right, so why don't we stop you there. We'll hear from Mr. Niman, and then you'll have your full rebuttal time available to you. Thank you, Your Honor. May it please the Court, John Niman here for Hartford. The bottom line in this case is that the district court opinion got this one exactly right, really on all three issues, especially the first one, which is the main topic we've discussed during argument today. I'll start there. That's the one concerning Stewart's request for long-term disability. And let me back up just at the outset and say the following. No one in this room has anything but sympathy for Ms. Stewart and what she is facing in terms of her condition. And I'll also just say, as a member of the Birmingham Bar personally, no one here has anything but respect for what Ms. Stewart was able to achieve in her career there. That said, I think Mr. Burke and I agree fully on both those points. We also agree fully on one other thing he told the panel, which is that the panel can use its common sense in this case. And that said, Stewart's position that she's entitled to long-term disability from Hartford really just defies common sense. To be clear, Stewart has not been denied disability by the plan that was in place when she became disabled. She's been receiving benefits for that disability from the insurer that was present at that time, Sun Life, to the tune of $250,000 a year. The common sense problem in this case, Judge Hull, there's really two elements to it. First of all, whether or not the district court correctly calculated just how close the benefits would have gotten Ms. Stewart to her pre-disability income, there is a windfall aspect of that because she is double dipping. She's getting two disability benefits when under any plan you're just entitled to one. The other big common sense problem here is that she's seeking coverage for an event that happened, her disability, when Hartford wasn't even on the scene, when Sun Life asked her insurer. That's just fundamentally at odds, that latter aspect of the common sense problem with elemental principles about how insurance works and what it does. Insurance covers risk, not certainty. Generally, to be covered by an insurance contract, you've got to show that your injury was caused by an event that the law and treatises refer to as fortuitous. That means in layman's terms, you can get insurance for things that may happen to you in the future, but you don't get insurance for things that have already happened to you in the past. That's common sense, that's insurance 101, and the policy needs to be read with those principles in mind. Can I ask you just another 101 question? I'm really sorry that I don't know this. Tell me sort of the architecture of a plan and the policies that administer that plan because I think I may be genuinely confused about the difference between an employee benefit plan and the insurance companies and policies that sort of service that plan. Is there a difference? Like I said, look, I think you're on to something. There might be a difference between the plan and the policy or your policies. Are they the same? Are they different? How do they interact? Well, I think my bottom line answer to your question, Judge Newsom, is that when we're talking about interpreting what these words mean in these documents, the right answer is not to ask, you know, what language do ERISA slash employee benefits lawyers speak. The right question is what is the ordinary meaning of these terms? And when we're talking about ordinary meaning. Yes, but to understand the ordinary meaning, we have to know what they are. An ERISA plan is this massive document. In fact, the ERISA law says it's so big and comprehensive and complicated, the plan document, that you have to do a summary plan description to your employees because nobody would ever understand the big documents. So they give you a summary plan description, right? That's true, Judge Hull. And the policy, a policy, I happen to have done these. A policy is the ERISA plan administrator can go to anybody out in the country and buy insurance coverage, can buy health coverage, can buy a disability policy, can buy any kind of policy that they pay for to operate the plan. Okay, to provide the coverage, the plan. My employer says, I'm going to give you a disability policy. Here's the benefits you can sign up for. The plan does all that. You sign up. The plan goes out and buys the policy with your premiums and funds the plan with the policy. Is that not right? Well, one critical caveat to that is that often a plan, if we're thinking about the plan as the document that the employer. That can be self-funded. Yeah, or the document that is the agreement between the employer and the employees as between the insurance company and the employees. That's what we're talking about with respect to the plan. When we talk about policy, there isn't necessarily going to be just one single policy that is associated with the plan. You may have several different insurers providing several different kinds of insurance. You can have medical insurance. You can have life insurance. This just deals with disability insurance. Ultimately, I think the question here has to be, what would an ordinary person, and not just the terms plan and policy, but what would an ordinary person looking at this lengthy clause in this particular document interpret it to mean? I would never say policy was planned, but that's just me. Let me stop on that. The word policy is used hundreds of times throughout that document, right? I don't know about hundreds, but certainly there are many, many times. Lots of times. The word plan is used in other contexts where it couldn't possibly mean policy. I'm not sure about that, Judge Hull. Let me point to some instances in these documents where the word plan is used in a way that's fully supportive of what the district court did and fully supportive of the way that Hartford interpreted it. Why don't you start out with the way it was used right here and what we've got to interpret it. Exactly. Exhibit A. This is actually Exhibit A to the plaintiff's complaint. This is the Sun Life document. It refers to itself as a plan. The document is very specific to Sun Life.  It lists Sun Life's address. This is a document very much in commonplace. Sun Life's provision of insurance is a part of the plan. Exhibit B in this regard is the document that appears at the very front of our administrative record. This is the Hartford document that we're dealing with. The very first page calls it your benefit plan. So it's entirely reasonable if we're thinking about the way that ordinary people speak and the interchangeability of the terms policy and plan, at least in ordinary speak. I'm not talking about necessarily the way that lawyers who specialize in this sort of work speak when they're talking with these legal issues through each other, but just in terms of the ordinary meaning of these terms, that when Burr Foreman moved from this Sun Life document and moved to the Hartford document, it was terminating this Sun Life document that calls itself a plan, in part, and sponsoring the Hartford document. So that gets us within a reasonable meaning of the language that appears in the Hartford document. There's a provision, Judge Hull, in the Hartford document with respect to plan termination that I also think is very helpful in this regard as well. This provision says that the plan can be terminated by the sponsor or by the plan administrator, which is Burr, and this, I think, is the important part, in whole or in part. So it's entirely possible to terminate a plan, in part, in the parlance of this document, and the suggestion by Ms. Stewart that what has to happen in these circumstances is that Burr Foreman has to terminate this entire formal entity that's called the Burr Foreman, not disability plan, but the Burr Foreman employee benefits plan number 501, would seem to be inconsistent with the notion that a plan can be terminated, in part. The sensible thing here is... It is. Do plan and policy, under the terms of your plan, have different legal meanings? I believe they do, and I think you just said that. The words plan and policy have different legal meanings. I think, shorn from context... Yes. ...plans refer to, for example, the Burr Foreman employee benefits plan number 501. In the context of this provision, as the district court noted, by far the most reasonable understanding of this provision is that plan is referred... At least when we're talking about the termination of a disability plan under which you're receiving disability benefits, we're talking about this process of moving from the Sun Life plan, this document that calls itself a plan where Sun Life is associated with it, to the Hartford plan. There's another provision in the Hartford plan that I think is really helpful in terms of instructing on what sort of assumptions are baked into this prior plan exclusion. It is on page 12, and it's the provision that explains when you get disability under the plan. I'll just read it to the court. The question asks, what are my disability benefits under the policy? Hartford says, we will pay you a monthly benefit if you become disabled while insured under the policy. The assumption is, I'll read it again, we'll pay you if you become disabled while insured under the policy. The assumption is not that you become disabled while insured under a previous policy. The assumption is that you became disabled consistent with basic insurance principles while Hartford was on the scene. There's another provision shortly before that on the same page that I think is very helpful in terms of instructing us on how benefit administration sensibly works in these kinds of cases. This provision deals with what happens if this policy terminates. The question is posed, do my benefits continue if the policy terminates? Hartford's answer is an emphatic yes. You are entitled to benefits while disabled. If you are entitled to benefits while disabled and the policy terminates, benefits will continue as long as you remain disabled by the same disability with some additional verbiage as well. So Hartford's message is, look, even if we get canned by Burr-Foreman, even if Burr-Foreman moves on to some other insurer, we've got you. We'll continue to pay your long-term disability benefits. But look, if you were disabled while under somebody else's watch, while under an earlier insurer's watch, they've got you. And that's exactly what happened in this case. Sun Life has had Ms. Stewart and has continued to pay her benefits. What Ms. Stewart is asking for is a double benefit on top of that one that simply is inconsistent with the way that long-term disability insurance works. So I think that Hartford's interpretation here is right. I've never heard of any prohibition against buying two separate long-term disability insurances that you can buy two if you want to. Agreed, Judge Hull. In fact, Ms. Stewart has supplemental disability here to the tune of about, I think, $72,000. And she paid the premiums for the second one, so why wouldn't it be two? That, to be clear, Judge Hull, was a mistake that Burr-Foreman made. Burr-Foreman should not have been charging her premiums. She has not sought a premium refund in this case. When Hartford made the benefits determination and informed her, she had said, well, I paid premiums under this, and Hartford said you need to talk to Burr-Foreman about that. If you read the policy, the policy is pretty clear. If you're disabled, you're not supposed to be paying disability premiums. But, Judge Hull, you said- You're saying Burr-Foreman owes her premium benefits for your own plan? Burr-Foreman should not have charged her. I think it's pretty clear the premiums that she says that she paid. For the Hartford plan? For the disability plan. But, to be clear, Judge Hull, you said you can buy two different disability-sets of disability insurance? I'm not saying you can't under this plan. I'm talking about you can go to the market. I don't think the mere fact that you're stacking, as long as you're under your income level, I don't think that's a windfall. Agreed. The problem here is that she's seeking insurance for a disability that arose under a prior insurer. That's where the real common-sense problems arise in this case. There's a double-dipping problem because the plan is only supposed to provide one benefit. I know you're saying context. We should read plan and policy the same. But if you go to Black's Law Dictionary, they have very different meanings. Very different meanings. Well, I didn't mean in the context of this plan. No, I said in the context of the plan. But if you go to Black's Law Dictionary, plan, retirement plan, and the policy are totally different. Can I just ask one follow-up about this? And then I'm going to try to direct you to the premium waiver issue. We've had a lot of discussion here about sort of like ordinary meaning, all of which sounds to me about like a de novo interpretation of this plan. But do I understand your position to be you think you went on de novo, but even if you don't went on de novo, you think that this is at the very least reasonable? Yes, absolutely, especially in light of these sort of background principles that I've been talking about today and sort of the common-sense element here. Also the references, say, on the first pages of these documents to the notion of plan. Mr. Burks argued earlier that contraproferendum would get him a victory in that regard. But the case law is quite clear that in the administration of a benefits plan, when a deferential standard of review applies, contraproferendum has no role to play. So in answer to my question, that kind of canon, so to speak, trumps contraproferendum in ERISA land. That's absolutely correct, Your Honor. I just need clarification in light of that. Is the language ambiguous and there are two reasonable interpretations? Are you saying the language is ambiguous? Let's assume you lose those clear on the first one. Are you saying it's ambiguous and there are two reasonable interpretations? Are you saying it's ambiguous and only Hartford's interpretation is reasonable? Well, because I disagree with you on the first one. I was going to say that the only interpretation I think here is reasonable is Hartford's. Okay. All right, so let's assume it is not clear, okay, on the first. On de novo review, it's not. Let's say we get past the first step. You're telling me I lose on the first step. And now we're moving on to a later step of the blank sheet. Yes, and so we have to see if the plan administrator's interpretation is reasonable. Right. And you're saying her interpretation is not reasonable. Her interpretation, I'm saying her interpretation is not reasonable and at the very least mine is much, much, much, much more reasonable. But that's what I'm trying to drill down. And the reason why is, number one, I think I've got some textual support. I know you disagree with me. I'm just asking you some questions. I don't know what I believe. I'm just asking you some questions. I'm just trying to understand, do we have two reasonable interpretations? You don't even concede her interpretation is reasonable. I don't concede that her interpretation is reasonable once you factor in the common sense problems that I've highlighted. But at the very least, the textual support I do have and the common sense concerns that weigh in on my side at the very least make Hartford's interpretation a reasonable one. And under abusive discretion, arbitrary and capricious type review, Hartford's decision therefore is due to be affirmed and the district court got that right as well. Just so I understand how blankenship works, you don't have to exclude the reasonableness of her interpretation. You just have to affirm the reasonableness of your interpretation. That's correct. Okay, got it. Okay, so will you talk to us for a few minutes about the premium waiver? Yes, so the premium waiver, I think the district court got this one exactly right as well. It was a closer call. I mean, look, Hartford's own actions show that it was a closer call. Hartford went back and forth a little bit on this point. But at the end of the day, both Hartford and the district court got this question exactly right as well. The key point on this issue is that it does not turn on whether Stewart has a disability. She definitely does. It doesn't turn on whether this disability has kept her from doing the things that made her a star in the Birmingham Bar. It definitely has as well. That's why I guess Stewart is getting the $250,000 from Sun Life because she's definitely disabled for those purposes. Waiver premium is different. The definition of disability is different. Hartford agrees to pick up the tab for the life insurance premium, not when the employee can't do their current occupation, but when they can't, in the words of the policy, do any work for which they are qualified. So can I ask you a question? Like how far are you willing to press that? I mean, any work, like truly any work, does that include volunteer work? Does it include like five minutes of Wal-Mart greeting or whatever? Any work, really any work? There's like a spectrum, it seems to me, between like the plain language of this policy, which seems to say any work, and like what happened in Helms, which to me just seems like completely unhinged. Right. Well, I mean, at the end of the day, you've seen the documents, Judge Newsom. You know that Hartford has taken a position that they can point to volunteer work and that should be enough. But at the end of the day, this case isn't Helms, and we're not in that land anyway because two things are clear. Number one, the evidence here showed, especially the Contardo and the neurologist examination, showed that both of them concluded that Ms. Stewart was capable of some full-time sedentary work. The second thing that's clear from the record is that Ms. Stewart never argued that she wasn't capable of doing something. Her argument was always that she wasn't capable of being a lawyer anymore, and not just that, a trial lawyer, and not just that, an equity partner. So if you read in particular her appeal letter, it's about 42 pages long, written by her former attorney, John Somerville. There's some especially, I think, instructive statements in there showing that Ms. Stewart's argument always has been that she wasn't required to show that she couldn't do anything. Her argument has always been that she's not able to be a lawyer anymore and that ought to be enough. In particular, I just want to read one to the court on page 31. Stewart argues there, an interpretation that the insured is required by the waiver of premium to leave Burn Foreman and seek other work or take a job as a legal assistant cannot be reasonable and would be an abuse of discretion. So between the fact that Stewart always was arguing the wrong standard and the fact that we've got clear evidence in the record from which Hartford can make a reasonable determination that she was capable of some other work, evidence that she really hasn't contested, Hartford's resolution of the second issue also is due to be affirmed. With that, I'm way over. Very well. Thank you so much, Mr. Niman. Mr. Burke, you've got your full three minutes remaining. Opposing counsel used two words, risk and double-dipping. As far as the risk goes, Hartford voluntarily accepted the risk. It came to Burn Foreman and it took on underwriting. It looked at the firm and it accepted the risk of insuring all of the equity partners. As an equity partner, Ms. Stewart was a mandatory participant in that claim. She had to be covered up. If they had told Burn Foreman that they were going to exclude her, they would not have gotten the business. She was a mandatory participant. We raised the anti-discrimination issue earlier, Section 510 of ERISA. If you take Hartford's position here, she is being excluded because she had no Parkinson's disease. And we think it raises serious anti-discrimination issues under the whole ERISA framework. The second point about double-dipping, opposing counsel made it sound as if Ms. Stewart is receiving $250,000 a year. She hadn't received any benefits from some life since she turned 65. The Hartford policy, if they had been paying her benefits, would have paid until she was 66. She would have received a full year of additional benefits just under Hartford. And that makes sense. Some life came on the scene in 2007. They were there then. They insured her income level of $638,000 in the year 2008. When she became partially disabled in 2009, she received partial disability benefits. She was still working full-time. When Hartford got the business in 2010, her salary had gone down from $638,000 to $300,000. That's the risk that Hartford willingly assumed. They came in and they underwrote that risk. So as far as the assumptions go and how a policy should be interpreted, the case law says it has to be done from the perspective of an ordinary insurer. If you look at the ordinary insurer, Carol Stewart, she had that $300,000 in income to insure against. She paid the premiums to do so. And she's entitled to the benefits. I didn't get to touch on the last argument. We think that the court's ruling ran afoul of Jones v. American General. And it should have been dismissed at the motion-to-dismiss stage that Hartford received a windfall to the $243,000 a year in premiums that he did not have to waive in favor of Ms. Stewart. I see my time is up. Okay, very well. Thank you both very much. Well argued on both sides. That case is submitted and this court is adjourned. All rise. Thank you. I'll go first. There we go.